**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**
**IN AND FOR SUSSEX COUNTY**

| | | |
|---|---|---|
| **AT&T,** | ) | |
| | ) | |
| | ) | |
| **Appellant,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. S14A-04-001 MJB** |
| | ) | |
| | ) | |
| **SUSSEX COUNTY BOARD OF** | ) | |
| **ADJUSTMENT** | ) | |
| | ) | |
| | ) | |
| **Appellee.** | ) | |

**Submitted:** January 30, 2015
**Decided:** April 30, 2015

*Upon Appellant's Appeal from the Sussex County Board of Adjustment,* **MODIFIED.**

**OPINION**

Richard A. Forsten, Esq. and Michael A. DeNote, Esq., Saul Ewing LLP, 222 Delaware Avenue, Suite 1200, Wilmington, Delaware 19899, *Attorneys for Appellant.*

James P. Sharp. Esq., Moore & Rutt, P.A., 122 West Market Street, Georgetown, Delaware 19947, *Attorney for Appellee.*

**BRADY, J.**

# I. INTRODUCTION

This action is an appeal of a decision made by the Sussex County Board of Adjustment (the "Board") denying a special use exception for Appellant AT&T ("Appellant" or "AT&T") to construct a permanent 100-foot telecommunications tower on a parcel of real property identified as Sussex County Tax Map Parcel Number 1-34-17.07-191.00 (the "Property").

Appellant argues that the Board committed reversible error in denying its application to build the telecommunications tower. Specifically, Appellant argues that the Board neglected to adequately consider key evidence in addressing the issues of (1) whether there was a demonstrated need for the tower, and (2) the impact of the tower on neighboring properties.

The instant appeal was filed in Superior Court on April 9, 2014. The matter was reassigned to this judge in November 2014. On January 12, 2015, the Court held an office conference with the parties to discuss the Court's concerns about the inadequacy of the Board's written decision. The Court received transcripts of the office conference on January 30, 2015, and the matter was taken under consideration.

The Court finds that the Board unreasonably concluded that there was no need for the proposed tower and that the proposed tower would have a substantial adverse effect on the use of neighboring property. For the reasons given below, the Court **MODIFIES** the decision of the Board of Adjustment and **GRANTS** Appellant's application for a special use exception to construct the permanent 100-foot tower.

## II. FACTS

### A. Background and Procedural History

Sussex County Code requires that a "special use" exemption be granted before a telecommunications tower can be constructed within 500 feet of a residential zone.[1] Once the other requirements for a telecommunications pole are met,[2] requirements that include demonstrating need, the special use exemption is to be granted unless the Board finds that the exemption will have a substantial negative effect on the use of neighboring property.[3] The subject Property is located at 32919 Coastal Highway (Route 1), just outside of Bethany Beach. Property is located on the east side of Route 1 with frontage on Route 1. Property currently contains a combination Arby's fast food restaurant and BP gas station. There is a water retention pond on the back of Property. Immediately adjacent to Property is an undeveloped parcel to the north, a furniture store to the south, and the Sea Pines Condominium community ("Sea Pines"), consisting of approximately 46 units, to the east and south. It is undisputed that the Property is within 500 feet of a residential zone.

On September 24, 2013, Appellant filed an application with the Board for a special use exemption to construct a 100-foot telecommunications tower on Property. Two similar applications had previously been filed by Appellant and its predecessor (for simplicity, called collectively "Appellant"). Appellant filed the first of these applications in August 2009. The Board approved the August 2009 application, but the decision was subsequently reversed on

---

[1] Sussex Cty. C. §115-194.2(A).
[2] These requirements appear in Sussex Cty. C. §115-194.2.
[3] Sussex Cty. C. §115-210.

3

appeal to Superior Court because the hearing on the application had been improperly noticed.[4] Because the statute does not endow the court with the power to remand, the effect of reversal is to require the applicant to file a new application if they wish to pursue the project.[5] After this reversal, Appellant filed a second application with the Board. The Board denied the second application, and Appellant appealed.

The denial of the second application was ultimately reversed by the Delaware Supreme Court on appeal.[6] The Court found that the Board erred in requiring Appellant to demonstrate *no adverse impact* on neighboring property. The Appellant need only show *no substantial adverse impact*.[7] The Court held that "special use exceptions are to be granted unless the Board finds the exception will substantially affect adversely the uses of adjacent and neighboring property."[8] Again, because there is no remand permitted under the statute, Appellant was required to file a new application.

During the period between the first and second applications, in June 2010, Appellant erected an 80-foot temporary telecommunications tower on Property.

On September 24, 2013, Appellant filed its third application for a special use exemption with the Board. On November 18, 2013, the Board held a public hearing on the application. The hearing was continued until December 9, 2013, where the Board heard additional testimony and evidence. At the conclusion of the public hearing, the Board announced that it would table the application. On January 27, 2014, the Board discussed the application and voted to deny the

---

[4] *Sea Pines Village Condominium Assoc. of Owners v. Bd. of Adjustment of Sussex County*, 2010 WL 8250842, *6 (Del. Super. Ct. Oct. 28, 2010).
[5] 9 Del. C.§ 6918(f); *H.P. Layton Partnership v. Bd. of Adjustment of Sussex County*, 2010 WL 2106187, *3 (Del. Super. Ct. May 27, 2010).
[6] *New Cingular Wireless PCS v. Bd, of Adjustment of Sussex County*, 65 A.3d 607 (Del. 2013).
[7] *Id*. at 611.
[8] *Id.* (internal quotation omitted).

special use exemption.  The Board issued its written decision, denying Appellant's third application, on March 25, 2014.  On April 9, 2014, Appellant filed the instant appeal in Superior Court.

## B. The Board's Decision

The Board's decision denying Appellant's third application is comprised primarily of six and a half pages, which contain 133 numbered propositions stating the factual background of the claim, some of the testimony that was given at the hearing, and the procedural background of the Board's decision.[9]  While almost all of these propositions are phrased in terms of a finding (each proposition begins with the phrase "The Board found that…"), they are, in fact, recitations of the testimony presented rather than conclusions of fact or law. Characteristic examples include item 7, "The Board found that David Gerk testified that the tower will 'kill the community,'" and item 35, "The Board found that Mr. Handy testified that he looked at ten (10) sales in Sea Pines and looked at the final sales price versus the listed sales price."[10]  The Board mentions that AT&T's appraiser, Leland Trice, who presented a contrary opinion, was present and sworn in; but the Board does not address the substance of Mr. Trice's testimony.[11]  In general, the Board identifies AT&T's witnesses but does not describe or discuss their testimony where it contradicts that of the opposition witnesses.[12]

The final numbered statement, item 134, gives the Board's conclusions of fact and law.[13] The Board found (a) that the proposed tower would have a substantial negative effect on the

---

[9] Board's March 25, 2014 Decision, Exhibit A to Docket Item 1 ("March 25 Decision").
[10] March 25 Decision at 1, 2.
[11] March 25 Decision at 5.
[12] March 25 Decision at 5.  Paragraph 90 reads, "The Board found that Mario Calabretta, Brock Riffel, Tom Zolna, William McCain, and Leland Trice were sworn in to testify in support of the Application on December 9, 2013."
[13] March 25 Decision at 7.

surrounding properties and (b) that Applicant had not demonstrated the need for the proposed tower.[14] Concerning the negative impact of the tower, the Board found that the proposed tower "substantially affects adversely the uses of adjacent and neighboring properties."[15] The Board based this conclusion on "[e]vidence and testimony from neighbors [that] confirm[s] that the temporary tower has substantially affected adversely the use and enjoyment of neighboring and adjacent properties and that the proposed tower will do the same."[16] Concerning need, the Board found that, having "weighed the evidence[,]… Applicant failed to demonstrate that the proposed tower was needed."[17] The Board reasoned that "Applicant's own website promotes that the Applicant has the best coverage[,] which means that the signal 'should be sufficient for most in-building coverage' in the area."[18] The Board found "persuasive" the testimony of those opposing the application who indicated that "cell phone coverage is available and adequate in the area surrounding the tower."[19]

### III. PARTIES' CONTENTIONS

### A. Appellant AT&T's Contentions

Appellant argues that the Board's decision is "not supported by substantial evidence."[20] Specifically, Appellant argues that the Board lacked substantial evidence for both of its findings—(a) that the proposed tower would substantially affect the neighboring properties, and

---

[14] March 25 Decision at 7.
[15] March 25 Decision at 7.
[16] March 25 Decision at 7. The Board earlier cites the testimony of Mr. Miller, a Sea Pines condominium owner, regarding the claims made on Appellant's website. March 25 Decision at 4, ¶ 62.
[17] March 25 Decision at 7.
[18] March 25 Decision at 7.
[19] March 25 Decision at 7.
[20] Appellant's Opening Brief, Item 9 ("Opening Brief") at 2.

(b) that Appellant failed to demonstrate the need for the proposed tower.[21] Appellant argues that this Court has the power, under 9 *Del. C.* §6918(f), to "reverse or affirm, wholly or partly, or…modify" the decision of the Board.[22] Appellant asks this Court to reverse the Board's decision and to order the special use exception granted so that Appellant may build the proposed tower.[23]

### *i. Appellant argues that the tower does not substantially affect use*

Appellant maintains that the current presence of the temporary tower provides good evidence of what the effects of a similar permanent structure would be. First, Appellant emphasizes the language of the Sussex County Code, which requires that a special use exemption shall not "substantially affect adversely the *uses* of adjacent and neighboring property."[24] Appellant argues that, while many residents testified that they do not like the temporary tower or the proposed tower, there is no evidence in the record that residents' *use* of their property has been, or will be, substantially affected.[25] In the words of Appellant, "[n]o one testified that the temporary tower has prevented them from parking their cars, using the pool, using their decks, or otherwise interfered in any meaningful way with the *use* of their property."[26]

Furthermore, Appellant argues that the telecommunications tower is consistent with the use and general character of the surrounding area.[27] "The community backs up to an Arby's fast food restaurant with a drive-thru window that is open late at night. The Arby's includes a gas

---

[21] Opening Brief at 17.
[22] Opening Brief at 23.
[23] Opening Brief at 23-24.
[24] Opening Brief at 17 (*citing* Sussex Cty. C. §115-210) (emphasis added).
[25] Opening Brief at 17.
[26] Opening Brief at 18 (emphasis in original).
[27] Opening Brief at 18.

station. There is security lighting for the combination Arby's/gas station. There is a furniture store adjacent to part of the community. There is a seafood restaurant, with the smell of crabs, and a hotel. There are fifty-foot utility lines running on the same side of the street as the Sea Pines community and much closer to units than the proposed tower."[28] In short, Appellant concludes, "this is precisely the type of setting where a cell tower will have no adverse affects because it is just another part of the crowded resort/urban landscape."[29]

Appellant acknowledges that many of the condominium units in Sea Pines are used as vacation rentals. Hence, the use of these properties may be substantially affected if rentals are substantially affected.[30] However, Appellant argues that there is no evidence that rentals have been impacted by the present temporary tower. Appellant cites the testimony before the Board of William McCain, a certified general appraiser.[31] Mr. McCain testified that in 2011, after the erection of the temporary tower, "the rental rates in Sea Pines Village were very comparable to other rental rates of similar units in the Bethany area."[32] Appellant also cites Mr. McCain's testimony concerning online comments posted by vacation renters of Sea Pines units.[33] Mr. McCain testified that he reviewed 59 online comments from people who had rented units in Sea Pines.[34] According to Mr. McCain, renters complained about various annoyances including the condition of some of the units, the smells from the crab house, and the views of the gas station; but "not one" mentioned the telecommunications tower.[35]

---

[28] Opening Brief at 18.
[29] Opening Brief at 18. Maps and photographs of the area depicting these features are found in the Record at Tabs 3, 16, and 28, as well as Exhibits attached to the 2013 Trice Report.
[30] Opening Brief at 18.
[31] Transcript of November 18, 2013 Board Meeting at 107.
[32] Transcript of November 18, 2013 Board Meeting at 107.
[33] Transcript of December 9, 2013 Board Meeting at 61-62.
[34] Transcript of December 9, 2013 Board Meeting at 61.
[35] Transcript of December 9, 2013 Board Meeting at 61-62.

Appellant also cites testimony from two Sea Pines unit owners, who both testified that they have still been able to rent their units since the construction of the temporary tower.[36] Appellant acknowledges that the owners did express concern that, while they are able to rent their units, they do not see repeat renters.[37]  However, Appellant argues that there is no good evidence that the lack of repeat renters is due to the temporary tower; and, even if it were, the use of the property is still not "substantially effected" as the units are still rented out every year even if not by repeat renters.[38]

Finally, Appellant argues that there has been no demonstrated impact on property value more generally.[39]  Appellant cites the findings of Leland Trice, an appraiser who plotted sales in the general Bethany Beach market, as well as sales in the Sea Pines community, both before and after erection of the temporary tower.[40]  Mr. Trice found that prices of units at Sea Pines tracked the market.[41]  Appellant notes that the other appraiser, Mr. McCain, came to a similar conclusion.[42] Appellant criticizes the methodology of the tower opponents' expert, Randall Handy, who presented a report comparing list prices to selling prices of units in Sea Pines.[43]  Mr. Handy concluded, based on discrepancies between listing prices and selling prices, that the temporary tower had negatively impacted property values.[44]  Appellant argues that this data is

---

[36] Transcript of November 18, 2013 Board Meeting at 226-27; Transcript of December 9, 2013 Board Meeting at 137.
[37] Opening Brief at 19.
[38] Opening Brief at 19.  Appellant points out that one of the two owners who complained about the lack of repeat renters owns a units that looks out directly over the Arby's/gas station.  While this owner attributes the lack of repeat renters to the telecommunications tower, Appellant argues that this could easily be due to any number of factors, including the view of the Arby's/gas station or the smell of crabs from the restaurant nearby.
[39] Opening Brief at 19.
[40] Transcript of November 18, 2013 Board Meeting at 94-97.
[41] Report of Leland Trice, Exhibit N to Docket Item 9 ("Trice Report") at 4.
[42] Transcript of November 18, 2013 Board Meeting at 109.
[43] Transcript of November 18, 2013 Board Meeting at 188.
[44] Transcript of November 18, 2013 Board Meeting at 191-192.

misleading as "[l]isting price provides no basis for determining a property's fair market value and is not a generally-accepted method for valuation."[45]

### ii. Appellant argues that Appellant has demonstrated need

Appellant argues that the Board's conclusion that the proposed tower is not needed is not supported by the evidence in the record. Appellant acknowledges that various opponents of the tower testified that the cellular phone service is currently adequate in the area[46] and that AT&T's coverage maps indicate adequate coverage in the local area.[47] However, Appellant maintains that coverage is only currently adequate due to the presence of the temporary tower, which the permanent tower would replace.[48] This argument was raised before the Board.[49]

Appellant also points to testimony it presented to the Board regarding the volume of calls handled by the temporary tower and the likely effects of removing the temporary tower.[50] Appellant presented data showing that the temporary tower handled an average of 4,400 calls per day in 2013, and that a vast majority of these calls occurred during the summer, when the tower handled roughly 10,000 calls per day.[51] Appellant's expert, Brock Riffel, who designs and evaluates telecommunications towers for a living, testified that, without the current or proposed tower, only 20 percent of these calls would go through; and, during peak summer weekends, the

---

[45] Opening Brief at 21 (*citing* various cases outside Delaware including *Farr West Investments v. Topaz Marketing, L.P.,* 220 P.3d 1091, 1095 (Idaho 2009)).
[46] Transcript of November 18, 2013 Board Meeting at 271.
[47] Transcript of November 18, 2013 Board Meeting at 244, 255.
[48] Opening Brief at 22.
[49] Transcript of December 9 Board Meeting at 30.
[50] Opening Brief at 23 (*citing* Transcript of November 18, 2013 Board Meeting at 33-40).
[51] Transcript of November 18, 2013 Board Meeting at 34-35.

percentage would drop as low as 5-10 percent.[52]  Appellant argues that failure rates of 10 percent or lower constitute "unreliable service" and "a gap in coverage."[53]

Appellant concludes that it has presented strong evidence that the proposed tower is needed and that the Board erred in relying on the testimony that coverage is currently adequate, as coverage is only adequate due to the existence of the temporary tower that the proposed tower would replace.

### B. Appellee Board's Contentions

The Board contends that its decision was supported by substantial evidence and free from legal error.  Specifically, the Board argues that there was sufficient evidence that (a) the proposed tower would have a substantial adverse effect on the use of the neighboring property, and (b) the need for the proposed tower was not adequately demonstrated.[54]  The Board argues that it applied the correct legal standard to these facts in denying the application on the basis that "1) the use substantially affects adversely the uses of adjacent and neighboring properties, and 2) the Applicant failed to demonstrate that the proposed tower was needed."[55]  The Board cites Sussex County zoning code §115-210(A) for the proposition that a special use exception may only be granted if the Board finds that the special exception "will not substantially effect adversely the uses of the adjacent and neighboring property."[56]  The Board also states that the zoning code contains "a number of other technical requirements" including "the requirement to

---

[52] Transcript of November 18, 2013 Board Meeting at 38-40.
[53] Opening Brief at 23 (*citing American Cellular Network v. Upper Dublin Township*, 203 F.Supp.2d 383, 394 (E.D. Pa. 2002)).
[54] Answering Brief at 21, 26.
[55] Answering Brief at 20 (internal quotations omitted).
[56] Answering Brief at 20 (*citing* Sussex Cty. C.§115-210(A)).

submit appropriate 'documentation substantiating the need for such tower at the proposed location.'"[57]

### *i. Appellee argues that there is substantial evidence of "substantial adverse effects"*

The Board argues that there is adequate evidence based on which it concluded that the proposed tower would have a substantial negative effect on the surrounding properties. The Board cites the testimony of numerous residents and experts, who testified that the proposed tower presents a safety hazard, nuisance, and aesthetic blight that drives down property values and rents.[58]

Concerning safety, including the concern of flooding caused by the proposed tower's proximity to a water retention pond, the Board cites the testimony of Sea Pines owners David Gerk, Barbara Gerk, Ron Gerk, Dana Gerk, and John Hefferly, as well as the testimony of Cathy Vingazo, an area resident and leader of a consortium of homeowners groups.[59] In addition to being a Sea Pines owner, David Gerk is also a mechanical engineer and holds a law degree.[60] Ron Gerk and John Hefferly both testified that the base of the proposed tower would be located within the retention pond.[61] David Gerk testified that the proposed tower represents a real threat based on its location in a retention pond, next to a gas station, and two blocks from the ocean.[62] David Gerk and Barbara Gerk testified that the temporary tower has already created flooding issues.[63] Ron Gerk testified that plans for the permanent tower indicate that the foundation would be fifteen feet into the existing retention pond and that the proposed site is actually only one

---

[57] Answering Brief at 20 (*citing* Sussex Cty. C. §115-194.2(D)).
[58] Answering Brief at 22-24.
[59] Answering Brief at 22-24.
[60] March 25 Decision at 1.
[61] Answering Brief at 22.
[62] Answering Brief at 22,
[63] Answering Brief at 23.

block from the ocean.[64]  The Board also cites the opinion of Dr. Jeremy Raines, a radiofrequency antenna and electromagnetic engineer, who expressed concern with the proposed tower's location in a retention pond and in close proximity to a gas station.[65]

Concerning aesthetics and nuisance, the Board cites testimony that the current temporary tower significantly impacts residents' use and enjoyment of their property in the Sea Pines resort community.[66]  One owner described the temporary tower as "loom[ing] over [his] backyard."[67]  The same owner said called the "bright red lights" of the temporary tower a "visible blight" in the night and day.[68]  The Board argues that "the homeowners' testimony as to quality-of-life issues may serve as evidence of a negative effect on neighboring property use," and the "Board may properly rely upon such evidence in denying an application for a special use exception."[69]

Concerning property values and rents, the Board cites the appraisal report from Mr. Handy, as well as the opinions of local realtors, Mr. Cox and Ms. York.[70]  Mr. Cox and Ms. York testified that they had personally witnessed potential buyers lose interest in Sea Pines after seeing the temporary tower.[71]  Mr. Cox also testified that sales prices of Sea Pines units near the temporary tower were lower than sales prices of other units in the community.[72]  Mr. Gerk and Mr. Cox also testified that the temporary tower has a significant impact on vacation rentals of the Sea Pines units.[73]

---

[64] Answering Brief at 22.
[65] Answering Brief at 25 (*citing* Report of Dr. Raines at 7).
[66] Answering Brief at 24.
[67] Answering Brief at 24 (*citing* Affidavit of David Gerk).
[68] Answering Brief at 24 (*citing* Affidavit of David Gerk).
[69] Answering Brief at 24-25 (*citing New Cingular Wireless PCS v. Bd, of Adjustment of Sussex County*, 2012 WL 5578866,  *rev'd on other grounds*, 65 A.3d 607 (Del. 2013)).
[70] Answering Brief at 25.
[71] Answering Brief at 25 (*citing* March 25 Decision at 3).
[72] Answering Brief at 26 (*citing* March 25 Decision at 3).
[73] Answering Brief at 26 (*citing* March 25 Decision at 2-3).

The Board concludes that, while there was testimony presented on both sides, the Board acted within the bounds of reason in choosing to adopt the view of the tower opponents concerning the negative impact of the proposed tower. "Although AT&T argues that its own witnesses were more persuasive on the question of the impact of the Tower on neighboring and adjacent properties, the Board disagreed, and the Board had substantial evidence on which to base its decision."[74]

### ii. Appellee argues that Applicant failed to demonstrate need

The Board argues that the burden is on the applicant to demonstrate need and that the Board acted reasonably in finding that Applicant did not meet this burden. The Board contends that the zoning code requires the applicant to demonstrate "that there are no existing structures within a two-mile radius of the proposed location available for collocation and that there is a need for such a tower at the proposed location."[75] The Board argues that Applicant failed to make both of these required showings.

First, the Board cites the opinion of Dr. Raines, who stated that "[t]here are a large number of existing nearby structures that serve as equally good if not preferable locations to place antennas from a coverage perspective[,] including a number of existing and available cellular sites."[76] These sites include "a large number of utility poles," which "are required under federal law to be made available to the applicant."[77] The Board also points out that the tower opposition submitted photographs of a 60-foot utility pole located .38 miles from Property and that these pictures appeared to show that the pole was being used by AT&T for

---

[74] *Answering Brief at 26.*
[75] Answering Brief at 3 (*citing* Sussex Cty. C. §115-194.2(C)) (internal quotations omitted).
[76] Answering Brief at 10 (*quoting* Report of Dr. Raines at 6-7).
[77] Answering Brief at 10 (*quoting* Report of Dr. Raines at 6-7).

14

telecommunications.[78]  AT&T testified that the sticker identifying the pole as being used by AT&T was in error and that the pole was in fact being used by competitor T-Mobile.[79] Nonetheless, regardless of whether the pole was used by AT&T or a competitor, the Board argues that the use of the pole for telecommunications demonstrates the availability of alternatives to the proposed tower.[80]  The Board also argues that AT&T failed to demonstrate why the 100-foot proposed tower is needed, when Applicant admits that it has achieved 93-84% reliability with the 80-foot temporary tower.[81]

Second, even putting aside the availability of alternatives to the proposed tower, the Board argues that Applicant has failed to demonstrate the need for additional coverage at all.[82] The Board points out that no witness testified that AT&T had been warned or sanctioned by the Federal Communications Commission ("FCC") for providing inadequate coverage before the construction of the temporary tower.[83]  The Board argues that it is reasonable to expect that AT&T would have received a warning or violation notice had coverage truly been inadequate.[84]

## C. Appellant AT&T's Response

In its Reply, Appellant argues that the evidence cited by the Board in its Answering Brief is not "substantial" and hence does not meet the standard that the Board's decision must be supported by "substantial evidence."[85]  Appellant further argues that most of the evidence on which the Board relies in the Answering Brief was not cited in the Board's decision.[86]  Appellant

---

[78] Answering Brief at 12 (*citing* Exhibit E to Answering Brief)
[79] Answering Brief at 12 (*citing* Transcript of December 9 Board Meeting at 38-39).
[80] Answering Brief at 12-13.
[81] Answering Brief at 6.
[82] Answering Brief at 6.
[83] Answering Brief at 6.
[84] Answering Brief at 6.
[85] Reply Brief at 3-4.
[86] Reply Brief at 1, 4.

suggests that this is an improper attempt by the Board to justify its decision after the fact. Putting aside whether the reasons given in the Answering Brief are different from the reasons on the basis of which the Board made its decision, Appellant argues that these reasons do not withstand scrutiny.[87]

### i. Appellant addresses Appellee's arguments concerning substantial interference

On the topic of whether the proposed tower would substantially interfere with residents' use of their property, Appellant separates and discusses the five concerns noted by the Board in its Answering Brief: general safety, aesthetics, flooding, nuisance, and effect on property values and rents.[88]

Concerning the alleged safety hazard, Appellant argues that the opinions were unsubstantiated by data (as in the case of Mr. Gerk's claims about hurricane risk)[89] or simply based on incorrect facts (as in the case of Mr. Gerk's claim that the proposed tower would be located in the water retention pond).[90] Appellant suggests that many of the hazards pointed out by the tower opponents are simply those that accompany any telecommunications tower; hence, if these were accepted as reasons not to build the proposed tower, no telecommunications towers would ever be built.[91] Appellant also argues that the safety risks of telecommunications towers are already addressed in the zoning code, which only requires that a tower be set back by one-third of its height (whereas the proposed tower would be set back in excess of its entire height)

---

[87] Reply Brief at 4.
[88] Reply Brief at 5.
[89] Reply Brief at 6 (*citing* Transcript of December 9 Board Meeting at 22-28). Appellant contends that Mr. Gerk's testimony that the proposed tower poses a hurricane risk was unsupported the data that the proposed tower would be built to all applicable safety codes, codes that are "designed to take into account the extreme weather events which occur on the east coast of the mid-atlantic [*sic*] region."
[90] Reply Brief at 5 (*citing* Transcript of December 9 Board Meeting at 22-23).
[91] Reply Brief at 6.

from the residential community.[92] Concerning flooding, Appellant contends that the testimony claiming that the temporary tower caused flooding is simply wrong.[93] Appellant argues that at least one Board member acknowledged that the increase in flooding was due to the weather rather than the tower.[94]

Concerning aesthetics and nuisance, Appellant argues that the testimony of the residents is not sufficient evidence of a substantial negative effect. Again Appellant argues that if mere resident disapproval were sufficient to defeat a telecommunications tower proposal, then this would rule out a telecommunications tower near almost any residential area.[95] Further, Appellant denies that any aesthetic effects of the tower substantially affect use or enjoyment and argues that the tower is in keeping with the general character of the neighborhood.[96] Appellant asks, "How does seeing the tower from the pool adversely affect the use of the pool? The pool is actually much closer to power lines and telephone lines and a hotel across the street."[97] Appellant also points out that while Sussex County zoning code mentions aesthetics when considering whether or not to grant variances, the code does not mention aesthetics when it comes to cell towers and special use permits.[98] Appellant argues that this omission is noteworthy, especially since other jurisdictions like New Castle County do address aesthetics in the cell tower permitting process by requiring towers to have some sort of camouflage.[99] Appellant argues that at least two federal courts have rejected aesthetics as a basis to deny a cell

---

[92] Reply Brief at 6-7 (*citing* Sussex Cty. C. § 115-194.2(F)).
[93] Reply Brief at 8-9.
[94] Reply Brief at 9 (*citing* Transcript of January 27 Board Meeting at 22-23).
[95] Reply Brief at 7.
[96] Reply Brief at 7.
[97] Reply Brief at 7.
[98] Reply Brief at 8.
[99] Reply Brief at 8 (*citing* New Castle Cty. C. § 40.03.326(E)).

17

tower proposal.[100] Appellant contends that residents' claims of nuisance ignore much more obtrusive features of the area, such as the Arby's drive-thru, the smell of crabs from the seafood restaurant, and other utility poles and lights in the vicinity.[101]

Concerning the alleged effect on property values and rents, Appellant argues that the testimony of owners like Mr. Gerk is "simply wrong" and "contrary to the actual market data provided by AT&T."[102] Appellant similarly criticizes the opinions of Handy, Cox, and York as unsupported by the actual data. For example, Appellant contends that the data on which Mr. Cox based his opinion that units near the tower sold for less was seriously flawed. First, Mr. Cox extrapolated from an inadequate sample size of only four sales.[103] Second, Mr. Cox failed to take into account the fact that the units near the tower that he considered were one-bedroom units and the unit farther away (with which he compared them) was a two-bedroom unit.[104] Appellant argues that the reasonable explanation for why the units near the tower sold for less than the unit farther away was the difference in number of bedrooms, not the location.[105] Appellant contends that it is well-established that expert opinion that is not supported by underlying evidence should not be given any weight.[106]

---

[100] Reply Brief at 8 (*citing Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 495-96 (2d Cir. 1999); *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Township*, 20 F.Supp. 2d 875, 880 (E.D. Pa. 1998)).
[101] Reply Brief at 9.
[102] Reply Brief at 10.
[103] Reply Brief at 11.
[104] Reply Brief at 11.
[105] Reply Brief at 11.
[106] Reply Brief at 11 (*citing* D.R.E. 702; *Sturgis v. Bayside Health Ass'n Chartered,* 942 A.2d 579 (Del. 2007)). The Court notes, however, that the Rules of Evidence do not apply to the Board of Adjustment. *See, e.g., New Castle Dev. Co. v. New Castle County Board of Adjustment*, 1996 WL 659481, *4 (Del. Super. Ct. Aug 13, 1996).

### ii. Appellant addresses Appellee's arguments concerning the need for the proposed tower

Concerning the issue of need for the tower, Appellant argues that the Board has changed its argument in the Answering Brief from the argument in the Decision.[107] Further, Appellant argues that all of the Board's arguments concerning need, past and present, are without merit. Appellant contends that in the Decision, the Board concluded that the tower is not needed because the coverage is currently adequate.[108] Appellant reiterates its earlier criticism of this argument; Appellant argues that the strength of current coverage is due to the temporary tower that the proposed tower would replace.[109]

Appellant addresses what it describes as the Board's four new arguments: (1) that Appellant only demonstrated need for an 80-foot tower, but the proposed tower is 100 feet; (2) that there were alternate locations available for the tower; (3) that Appellant did not present evidence of complaints of inadequate service prior to the construction of the temporary tower; and (4) that there is no evidence that the area is not covered by other telecommunications providers.[110] Appellant argues that all of these arguments are equally baseless.

First, Appellant argues that it is unreasonable to require an applicant to demonstrate that a tower of a specific height is needed. Appellant argues that "the Board can't simply say after the fact that it is denying a 100-foot tower because sufficient evidence wasn't provided that a slightly shorter tower [would not] satisfy the need. Where does it end? Can the Board deny an applicant for not proving a 90-foot tower [would not] work, or a 95-foot tower?"[111] Second, Appellant contends that the evidence of alternative locations does not rise to the level of

---

[107] Reply Brief at 13.
[108] Reply Brief at 13.
[109] Reply Brief at 13.
[110] Reply Brief at 13.
[111] Reply Brief at 14.

19

"substantial evidence."[112] Appellant argues that Dr. Raines' assertion that AT&T's models "cannot possibly be accurate" is merely a conclusory opinion, unsupported by evidence or demonstrated methodology.[113] Concerning Raines' testimony that AT&T could use a utility pole instead of a telecommunications tower, as is used by competitor T-Mobile, Appellant contends that it was made clear at the hearing that this solution is not feasible due to the different technology used by AT&T.[114]

Appellant admits that evidence of complaints of lacking or inefficient service was not presented, but argues that it had no obligation to do so.[115] Appellant contends that it addressed the effects of removing the temporary tower and argues that this is sufficient to demonstrate need.[116] Appellant dismisses the Board's argument that there is no significant gap in coverage because AT&T did not demonstrate that no other cellular provider is able to provide service in the area. Appellant contends that this argument is based on authority that is no longer good law.[117] Appellant contends that the Federal Communication Commission declared the so-called "one-provider rule" inconsistent with the Federal Telecommunications Act in 2009, and the invalidity of the rule has subsequently been recognized by two Third Circuit District Courts.[118]

---

[112] Reply Brief at 15.
[113] Reply Brief at 15.
[114] Reply Brief at 15 (*citing* Transcript of December 9 Meeting at 40-41).
[115] Reply Brief at 16.
[116] Reply Brief at 16.
[117] Reply Brief at 17 (*citing Omnipoint Communications Enterprises v. Zoning Hearning Bd. of Eastown Township*, 331 F.3d 386, 396 (3d Cir. 2003)).
[118] Reply Brief at 17 (*citing Liberty Towers, LLC v. Zoning Hearing Board of Lower Makefield*, 748 F.Supp.2d 437 (E.D. Pa. 2010); *Clear Wireless, LLC V. City of Wilmington*, 2010 WL 3463729 (D. Del. Aug. 30, 2010)).

## IV. LEGAL STANDARD

The standard under which a court reviews a decision of the Board of Adjustment is deferential.[119] The Board's decision should be disturbed only in limited circumstances.[120] So long as the Board's conclusions are (a) supported by "substantial evidence"[121] in the record and (b) "free from legal error,"[122] the Board's decision must stand—even if the court itself would have decided otherwise.[123] Under 29 *Del. C.* §10142(d), the court's review is limited to matters of law, and the court is bound by the facts presented before the administrative board in the instant matter.[124]

Legal error alone is sufficient for reversal. "An error of law by the Board in applying the correct legal standard for a special use exception precludes judicial review of the sufficiency of the evidence before the Board."[125] Hence, once the court has determined that there is no legal error, "[t]he Court gives great deference to the Board, requiring only evidence from which an agency could fairly and reasonably reach the conclusion that it did."[126] However, "upon a showing of arbitrary or capricious action" by the Board, the reviewing court "may reverse or affirm, wholly or partly, or may modify the decision brought up for review."[127] The court may

---

[119] 29 *Del. C.* § 10142; *Jones v. Bd. of Adjustment of Sussex County*, 2007 WL 441942, *2 (Del. Super. Ct. Jan. 26, 2007).
[120] *Delaware Transit Corp. v. Roane*, 2011 WL 3793450, *6 (Del. Super. Ct. Aug. 24, 2011).
[121] *See Unemployment Ins. Appeal Bd. v. Duncan*, 337 A.2d 308, 309 (Del. 1975).
[122] *See Longobardi v. Unemploymt. Ins. Appeal Bd.*, 287 A.2d 690, 692 (Del. Super. Ct. 1971), *aff'd*, 293 A.2d 295 (Del. 1972).
[123] *Delaware Transit Corp.*, 2011 WL 3793450 at *6.
[124] *See, e.g., Tenneco Oil Co. v. Department of Energy*, 475 F. Supp. 299, 307 (D. Del. 1979).
[125] *New Cingular Wireless PCS*, 65 A.3d at 612.
[126] *Jones*, 2007 WL 441942 at *2 (internal quotation, citations omitted).
[127] 9 *Del. C.* § 6918(f).

not remand the case to the Board for further proceedings.[128] Reversal "vacates the decision, and the applicant may re-apply with the proceedings before the Board beginning anew."[129]

The statutory language of 9 *Del. C.* § 6918(f) clearly allows for "modif[cation] of the decision" by the court, but case law is silent on the scope of the court's power to "modify" the decision in the specific case of the Board of Adjustment. However, in *JMB Income Properties*, the court modified a decision of the Board of Assessment Review, ordering the Board to modify the tax assessment value of appellants' property from $20 million to roughly $13.4 million.[130]

The scope of the court's review in *JMB Income Properties* was governed by 9 *Del. C.* § 8312(c), which contains a similar provision to that in 9 *Del. C.* § 6918(f), both of which permit the court to "modify" the decision of the Board.[131] The court found the Board's decision to use market rent rather than contract rent in valuing the property was "unwarranted and conjectural" given that "the preferred method for establishing an income valuation on property existing in 1983 [was] to use actual data."[132] The court held that the Board's failure to consider the effect of the long-term lease in its valuation was "arbitrary and capricious."[133] Applying the preferred valuation method based on contract rent, the court ordered the assessment modified.[134]

---

[128] *H.P. Layton Partnership v. Bd. of Adjustment of Sussex County*, 2010 WL 2106187, *3 (Del. Super. Ct. May 27, 2010).
[129] *Riedinger v. Bd. of Adjustment of Sussex County*, 201 WL 3792198, *3 (Del. Super. Ct. Sept. 29, 2010) (*citing Hellings v. City of Lewes Bd. of Adjustment*, 1999 WL 624114, *3 (Del. 1999).
[130] *JMB Income Properties v. New Castle County Bd. of Assessment Review*, 1994 WL 45336, *2 (Del. Super. Ct. Feb. 3, 1994).
[131] *Id*. at *2 (citing 9 *Del. C.* § 8312(c)).
[132] *Id.* at *5.
[133] *Id.*
[134] *Id.* at *6.

V. DISCUSSION

Under 9 *Del. C.* §6917, the Sussex County Board of Adjustment has the power to "[h]ear and decide, in accordance with the provisions of any zoning regulation, requests for special exceptions." Under Sussex County Code §115-194.2, a "special use" exemption is required to construct a telecommunications tower within 500 feet of a residential zone.[135] Once an applicant meets the other requirements under §115-194.2, including demonstrating need,[136] the special use exemption is to be granted unless the Board finds that the exemption "will substantially affect adversely the uses of adjacent and neighboring property."[137]

## A. The Sufficiency of the Board's Written Decision and the Record

While the court's standard of review is deferential, it is the Board's duty to provide the court with a sufficient record.[138] "[W]hen making a decision, a board of adjustment must particularize its findings of fact and conclusions of law to enable the Superior Court to perform its function of appellate review."[139] In order to meet this burden, "a Board may not simply make conclusory statements, or transcribe the legal standard of review. The Board must address the specific issues raised at the hearing and apply the law to those uniquely crafted facts."[140] While weak analysis is not an automatic ground for reversal, it can be evidence that the decision was arbitrary and capricious.[141]

In *H.P. Layton Partnership*, the court reversed the Sussex County Board of Adjustment's decision granting a special use exemption and an area variance for a windmill on the roof of the

---

[135] Sussex Cty. C. §115-194.2(A).
[136] Sussex Cty. C. §115-194.2(D).
[137] *New Cingular Wireless PCS*, 65 A.3d at 612 (*citing* Sussex Cty. C.§115-210).
[138] *H.P. Layton Partnership*, 2010 WL 2106187 at *4.
[139] *Jones*, 2007 WL 441942 at *3 (internal quotation, citations omitted).
[140] *Id.*
[141] *See, e.g., Riedinger v. Bd. of Adjustment of Sussex County*, 2010 WL 3792198 (Del. Super. Ct. Sept. 29, 2010).

applicants' property.[142]  The Board's decision "state[d] in conclusory fashion that the Board 'believed' that the Applicant had met the standard for a variance.  It did not set forth the standard either for a special use exception or for an area variance. It did not identify any evidence that might meet either standard.  Instead, the Board simply granted the application, finding that it would not adversely affect the uses of neighboring properties."[143]

Like in *H.P. Layton*, the complete lack of analysis in the Board's written decision in the instant case suggests that the decision was arbitrary and capricious.  Six of the seven pages consist of repetition of testimony phrased as factual findings (each prefaced with the phrase "The Board found…"); however, all of these are recitations of what one or another witness said, rather than conclusions of fact or law.[144]  These propositions simply describe events and testimony contained in the record.  For example, item 2 reads, "The Board found that the Office of Planning & Zoning received a letter from the Sussex Conservation District and an email from Angela Horning about the Application."[145]  Item 18 reads, "The Board found that David Gerk testified that the tower adversely affects the uses and enjoyment of surrounding properties."[146]  Item 27 reads, "The Board found that Dr. Raines testified that he disputes that the Applicant's computer models are accurate.  Dr. Raines testified that it is impossible to be that precise when the propagation path is ever changing and that predicting coverage is like predicting the weather."[147]

In the first six pages, the Board thus recites the testimony of witnesses but provides no analysis or evaluation of this testimony.  The Board does not even indicate whether it accepts

---

[142] *H.P. Layton Partnership*, 2010 WL 2106187.
[143] *Id.* at *4.
[144] March 25 Decision at 1-6.
[145] March 25 Decision at 1.
[146] March 25 Decision at 2.
[147] March 25 Decision at 2.

any or all of this testimony as true. It is only in the final paragraph of the decision, item 134, on the last page, that the Board provides what purports to be analysis.[148] But this discussion is unhelpful in communicating the basis on which the Board made its decision. The paragraph is composed mainly of broadly-phrased conclusory statements such as "Evidence and testimony from neighbors confirm that the temporary tower has substantially affected adversely the use and enjoyment of neighboring and adjacent properties and that the proposed tower will do the same" and "The opposition presented testimony and evidence which indicates that cell phone coverage is available and adequate in the area surrounding the tower and that the tower is unnecessary."[149]

The Board's treatment of the specific requirements set out by Sussex County Code is cursory. As pointed out by the parties, Sussex County Code specifically sets out a number of requirements including need[150] and then states that the exemption should be granted when these requirements are met unless the Board finds a substantial negative effect on the neighboring property.[151] The Board's final paragraph, in which it purports to provide its analysis, begins by stating that the application "failed to meet the standards for granting a special use exception because the use substantially affects adversely the uses and enjoyment of neighboring and adjacent properties" and later adds that need was not demonstrated.[152] However, the Board's conclusion concerning need is based on clearly erroneous premises. The Board explains why it does not find need is as follows:

The evidence demonstrates that the Applicant's own website promotes that the applicant has the best coverage[,] which means that the signal "should be

---

[148] March 25 Decision at 7.
[149] March 25 Decision at 7.
[150] Sussex Cty. C. §115-194.2.
[151] Sussex Cty. C. §115-210.
[152] March 25 Decision at 7.

25

sufficient for most in-building coverage" in the area. The opposition [to the tower] presented testimony and evidence which indicates that cell phone coverage is available and adequate in the area surrounding the tower and that the tower is unnecessary. The Board found this testimony and evidence persuasive.[153]

This explanation rests on the erroneous assumption that the current coverage is representative of the level of coverage that would be available without the proposed tower. The current coverage is with the existing temporary tower, which plays a similar role to the proposed tower. The tower opponents presented no evidence that coverage would be adequate in the absence of a tower to refute AT&T's *prima facie* showing of need. The Board clearly failed to "particularize its findings of fact and conclusions of law" in a way that facilitates this Court's review.[154] The insufficiency of the written decision is *prima facie* evidence that the decision was arbitrary and capricious.

The Court now considers the entire record to determine if, despite the insufficiency of the written opinion, there was a reasonable basis for the decision.[155] It is to the evidence in the record that the Court now turns.

## B. The Need Issue

The first question is whether the Board's finding that AT&T did not demonstrate need is reasonable and not arbitrary or capricious. As a preliminary matter, Appellant is correct to point

---

[153] March 25 Decision at 7.
[154] *Jones*, 2007 WL 441942 at *3.
[155] *Id*. at *4.

out that a showing of need does not require a showing that there is no other adequate cellular provider serving the area.[156]

Considering the evidence presented by both parties concerning need, the Court now finds that the Board acted arbitrarily and capriciously in finding no need. The reasons cited in the Board's analysis all focus on the current adequacy of coverage, ignoring the fact that this adequacy may be reasonably attributed to the temporary tower, which the proposed tower is intended to replace. There is no evidence in the record that explains the tower opponents' contention that coverage would still be adequate were the temporary tower removed and no permanent tower erected. To the contrary, AT&T presented evidence of the volume of calls handled by the temporary tower and presented an expert, Brock Riffel, who opined that without the tower only 20 percent of those calls would go through.[157] Riffel's testimony was not addressed in the Board's written decision, other than to say that Riffel was one of the persons giving testimony. While deficiencies in the written decision alone are not grounds for reversal, the Board's statements in its written decision are evidence of arbitrariness or capriciousness insofar as they reveal the flawed and incomplete reasoning on which the Board relied. In this case, the Court finds that the Board acted arbitrarily and capriciously by concluding that the proposed tower is not needed based on the fact that coverage is not currently deficient, a fact that can be explained by the evidence of coverage provided by the temporary tower, evidence that the Board does not cite or address.

---

[156] Reply Brief at 17 (*citing Liberty Towers, LLC v. Zoning Hearing Board of Lower Makefield*, 748 F.Supp.2d 437 (E.D. Pa. 2010)); *see also Clear Wireless, LLC v. City of Wilmington*, 2010 WL 3463729, *2 (D. Del. Aug. 30, 2010) (explaining that, under *Chevron* deference, the Federal Communication Commission's rejection of the one-provider rule is binding on the courts).
[157] Transcript of November 18, 2013 Meeting at 33-40.

## C. The Impact Issue

The Board's written decision does not cite any specific facts as supporting its conclusion that the proposed tower would substantially adversely affect use and enjoyment of nearby properties other than "evidence and testimony from neighbors" concerning the negative effects of the current temporary tower.[158] Looking beyond the Board's written decision to the record, the Court finds no evidence of a substantial adverse effect on use and enjoyment. The two most compelling arguments against the tower concern property values and aesthetics. Concerning property values, Appellant presented the testimony of Leland Trice, who found that the sales prices of units in Sea Pines tracked the market,[159] and William McCain, who found that the rental rates in Sea Pines were similar before and after the erection of the temporary tower.[160] On the other side, the tower opponents' expert, Randall Handy, opined that units in Sea Pines were selling for less than their list prices,[161] and realtors, Mr. Cox and Ms. York said that they had personally witnessed potential buyers lose interest in Sea Pines after seeing the tower.[162]

The Court finds methodology used by Handy was seriously flawed such that a reasonable Board could not have credited Handy's testimony over that of Appellant's appraisers. Handy compared list prices to selling prices and concluded that the tower diminished property values based on the discrepancy between these numbers.[163] However, it is well-accepted that asking price is not an appropriate estimate of fair market value of land.[164] The testimony of Mr. Cox

---

[158] March 25 Decision at 7.
[159] Transcript of November 18, 2013 Board Meeting at 94-97.
[160] Transcript of November 18, 2013 Board Meeting at 107.
[161] Transcript of November 18, 2013 Board Meeting at 191-192.
[162] March 25 Decision at 3.
[163] Transcript of November 18, 2013 Board Meeting at 191-192.
[164] *See, e.g., Farr West Investments v. Topaz Marketing, L.P.*, 220 P.3d at 1095 (The court agreed that "the current listing price of the real property is not substantial and competent evidence of its fair market value. The current listing price could be more or less than the land's fair market value"). In Delaware, Family Court has consistently separated listing price of property from its fair market value. *See, e.g., Karlsen v. Karlsen*, 1992 WL 67010, *4

and Ms. York is anecdotal in nature, rather than relying on scientific methodology.[165] And, the fact that some prospective buyers did not purchase the properties does not establish that no one would purchase the properties for fair market value as established by the surrounding communities with comparable characteristics. The Court finds that the Board acted unreasonably in relying on Handy's flawed appraisal and the realtors' anecdotes over Applicant's two appraisals, which do not have the same flaws. The Board has given no explanation for crediting Handy, Cox, and York's flawed opinions over those of Appellant's appraisers other than its blanket statement that it found the testimony on which its decision was based "persuasive."[166] Counsel for the Board argued that term meant that the Board had appropriately made a credibility determination within the Board's authority.[167] Like in *JMB Income Properties*, the Board chose to rely without justification on flawed valuation methods over methods accepted in the industry.[168] In *JMB Income Properties*, the Board relied on market rent rather than the contract rent, where the latter was the accepted method of valuation.[169] In the instant case, the Board accepted Handy's testimony that Sea Pines units were selling for less than list prices as an indicator of diminished value, even though list prices are not an appropriate measure of market value.[170] Similarly, the Board appeared to credit anecdotal evidence of potential buyers losing interest over the objective valuation methods used by AT&T's appraisers.

The Board did hear and cite in its written decision testimony from several Sea Pines owners concerning the alleged negative aesthetic effects of the current temporary tower. Among

(Del. Fam. Ct. Jan. 27, 1992); *Mooney v. Mooney*, 1992 WL 69319, *3 (Del. Fam. Ct. Feb. 13, 1992). The Court is aware of one case in which Family Court substituted listing price for fair market value, but this was only because the parties had offered no experts. *Cycyk v. Cycyk*, 1996 WL 860585, *4 (Del. Fam. Ct. Dec. 24, 1996).

[165] Appellant points out that Mr. Cox extrapolated from a sample size of only four units and failed to account for the fact that the units he was comparing

[166] March 25 Decision at 7.

[167] Transcript of January 15, 2015 Office Conference at 5-6, 31.

[168] *JMB Income Properties*, 1994 WL 45336 at *5.

[169] *Id.*

[170] *See, e.g., Farr West Investments,* 220 P.3d at 1095.

the evidence in the Record is the Affidavit of David Gerk, a Sea Pines owner. Mr. Gerk called the temporary tower "a severe visual blight."[171] Gerk explained, "[The tower] is the first, last, and main thing I see when I drive up to my home and when I leave my home. It looms over my backyard, is directly in my sight line from my balcony[,] and looms over the common areas between our buildings as well as the parking lot."[172] Gerk further testified that potential renters have lost interest in the property after learning of the cell tower.[173] Similar testimony was given by other Sea Pines owners.

While the law in Delaware is unclear, other jurisdictions have found that aesthetic concerns may be considered in zoning decisions.[174] In *Omnipoint*, the court held that under Pennsylvania law, neither aesthetic nor economic concerns are sufficient grounds for denying an application for a special exemption, but this does not mean that they cannot be considerations.[175] However, "[g]eneralized concerns and conclusive statements within the record about the aesthetic and visual impact on the neighborhood do not amount to substantial evidence" to justify denying an exemption.[176] In *Cellular Telephone Co. v. Oyster Bay*, the Court of Appeals recognized that under New York law, aesthetic concerns may be a sufficient basis for a zoning decision, but the court did not find the aesthetic concerns compelling enough in that particular case because the concerns expressed were few, vague, and sometimes clearly based on misinformation about what the finished project would look like.[177]

---

[171] Affidavit of David Gerk at 1.
[172] Affidavit of David Gerk at 1.
[173] Affidavit of David Gerk at 2.
[174] *Omnipoint Corp. v. Zoning Hearing Bd of Pine Grove Township.*, 20 F.Supp. 2d 875 (E.D. Pa. 1998); *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490 (2d Cir. 1999).
[175] *Omnipoint Corp.,* 20 F.Supp. 2d at 880.
[176] *Id.*
[177] *Cellular Telephone Co.*, 166 F.3d at 495.

In the instant case, the aesthetic concerns expressed by opponents in the record are vague and nonspecific. The tower is described as a "visual blight," that "looms" over the Sea Pines complex.[178] However, the Board fails to account for Appellant's argument that the tower is in accord with the mixed-use character of the area, which includes utility lines, a gas station, fast food restaurant, hotel, and seafood restaurant.[179] Combining the general nature of the aesthetic complaints with the lack of any concrete evidence of impact on use other than aesthetics, the Court finds that the Board's finding of substantial adverse effects is not supported by the evidence.

## D. Modification

At this stage, Appellant has been before the Board and the Court three times regarding this project. The first time, the Board's approval was reversed on procedural grounds.[180] The second time, the Board applied the wrong standard and denied the application, resulting in the decision ultimately being reversed by the Supreme Court.[181] Because the statute provides no authority to remand, Appellant has had to file a new application each time. While courts typically reverse rather than modify decisions of the Board of Adjustment Review, the statute, 9 *Del. C.* § 6918(f) clearly provides the Court with the power to modify when appropriate. This is such an instance.

In *JMB Income Properties*, the court modified a decision of the Board of Assessment Review under a statute that, like 9 *Del. C.* § 6918(f), explicitly gives the court the power to

---

[178] Affidavit of David Gerk at 1.
[179] Opening Brief at 18.
[180] *Sea Pines Village Condominium Assoc. of Owners v. Bd. of Adjustment of Sussex County*, 2010 WL 8250842, *6 (Del. Super. Ct. Oct. 28, 2010).
[181] *New Cingular Wireless PCS v. Bd, of Adjustment of Sussex County*, 65 A.3d 607 (Del. 2013).

modify.[182] Notably, however, the statute in *JMB Income Properties* allows for affirmation, reversal, remand, or modification.[183] The statute in the instant case only allows the court to affirm, reverse, or modify.[184] In the absence of the option to remand, the Court finds Appellant's argument that the decision be modified to grant the permit especially compelling. The Court finds that AT&T demonstrated need through the expert testimony of Brock Riffel, who testified concerning the number of calls handled by the temporary tower, the unavailability of alternate sites and structures nearby, and the likely effects of removing the temporary tower.[185] The evidence presented by the opposition in arguing that there is no need was predicated on the existence of the current tower or the assumption that there are other structures nearby that could be collocated, assumptions which AT&T's expert testified are incorrect. Concerning the need specifically for a 100-foot tower as opposed to the current, temporary 80-foot tower, the Court follows the view expressed by AT&T's expert that the 100-foot tower is necessary.[186] The Court further finds that, contrary to the conclusion reached by the Board, the evidence in the record, which consists of vague and generalized expressions of residents' aesthetic distaste for the tower and concerns about safety that are already addressed by the zoning code and federal telecommunications regulations, does not reasonably support a finding of substantial adverse impact on the use of neighboring property, particularly in the face of objective and, the Court finds, compelling evidence to the contrary.

---

[182] *JMB Income Properties*, 1994 WL 45336 at *2.
[183] 9 *Del. C.* § 8312(c).
[184] 9 *Del. C.* § 6918(f).
[185] Transcript of November 18, 2013 Meeting at 34-40.
[186] Transcript of November 18, 2013 Meeting at 42.

## VI. CONCLUSION

For the foregoing reasons, the decision of the Sussex County Board of Adjustment is **MODIFIED** and AT&T's Application for a special use exception to construct a permanent 100-foot telecommunications tower on Property is **GRANTED**.

**IT IS SO ORDERED.**

_____/s/_____
**M. JANE BRADY**
Superior Court Judge